IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAVID F. KASSERMAN,

        Plaintiff,

  v.

AGENT DONALD DUNCAN,

    and                                         <u>COMPLAINT AND</u>
                                                        <u>JURY DEMAND</u>

AGENT KENNETH WARD,

    and

AGENT BRENT HENDRICKS,

    and

AGENT MILIND PATEL,

    and

AGENT KEVIN JOLLIFF,

        Defendants.

## <u>JURISDICTION</u>

1.      This is a civil rights action for police misconduct. Dr. Kasserman is a 66-year-old, semi-retired surgeon. He enjoys playing "Blackjack". After he made complaints to the Ohio Casino Control Commission regarding activities at the local casino in Columbus, the Defendant Gaming Agents engaged in retaliatory conduct toward Dr. Kasserman, including malicious prosecutions, arrest without probable cause and unnecessary uses of force upon him. Plaintiff alleges that the Defendants violated his rights guaranteed by the First and Fourth Amendments to the United States Constitution and 42 U.S.C. §1983, as well as supplemental claims under Ohio law. The Court has jurisdiction pursuant to 28 U.S.C.§§1331, 1343 and 1367(a).

## PARTIES

2.      Plaintiff David F. Kasserman is a citizen of the United States, and a resident of Columbus, Ohio.

3.      Defendants Duncan, Ward, Hendricks, Patel and Jolliff are gaming agents employed by the Ohio Casino Control Commission.  They are peace officers under Ohio law, certified as such by the Ohio Peace Officer Training Commission, after having satisfactorily completed an approved peace officer basic training program.  Defendant Ward is a supervisor, and the other Defendants work under his supervision.  They were at all times relevant acting within the scope of their employment and under color of state law.  They are sued in their individual capacities.  All acts alleged against these Defendants were done knowingly, intentionally, maliciously, recklessly, in bad faith and with callous indifference to the Plaintiff's constitutional rights.

## FACTS

### A.  Plaintiff David F. Kasserman

4.      Plaintiff obtained his Doctor of Osteopathy degree from Ohio University in 1984, and finally his Doctor of Medicine degree from Northeastern Ohio Medical University in 1986. After completing medical school, he served an internship at a hospital in Cooperstown, New York. He was a visiting clinical fellow at Columbia University from 1986-1987, and he served a two-year residency at Case Western Reserve University/Mt. Sinai Medical Center in Cleveland.

5.      Dr. Kasserman then began a 32-year active practice as a general surgeon, primarily in the central Ohio area.  He is certified as a specialist by the American Board of Surgery, and he is a Fellow of the American College of Surgeons. From 1991 through 2009, he had offices in Mt. Vernon, Ohio, practicing independently and then founding a small group practice called Knox Surgical.  During those years, he performed 10-20 surgical procedures per week, from routine

scheduled procedures to emergency traumatic wounds.  He worked in numerous hospitals in the Columbus and Central Ohio area.  He was chief of Surgery at Knox Community Hospital for 5 years during this period.

6.      In addition to his demanding surgical practice Dr. Kasserman worked as a clinical instructor at Kenyon College, and later at the Midwestern College of Osteopathic Medicine.  He also did community service work, such as providing free physical examinations for high school athletes.

7.      In 2009, Dr. Kasserman left his private practice and went to work full-time at the Knox Community Hospital in Mt. Vernon.  He sold his office building and donated the money to the hospital.  In addition to scheduled surgeries, he was on call to handle emergency wound care. He worked there full time until 2013.  Then, seeking a change, Dr. Kasserman accepted a job with a medical center in Arizona.  He moved there and performed surgical procedures at their facilities in Bisbee and Douglas, Arizona for three years.

8.      In 2017, Dr. Kasserman accepted employment with Vorka Wound Care, and returned to central Ohio.  He worked as a wound care surgeon for Vorka for fifteen months.

**B.  A New Hobby and New Friends**

9.      One leisure activity that Dr. Kasserman enjoyed was playing the card game Blackjack.  Blackjack appealed to him because it is not purely a game of luck.  He learned that this game required intellect, and you could use your skills to improve your odds.  By increasing your bet under certain circumstances decreasing it in others, based upon what cards had already been played in prior hands, you could have a better outcome sometimes.  Although the casino, or "the house", always has a mathematical advantage, a player can make choices that decrease that advantage. Dr. Kasserman enjoyed that challenge.

10.     Over time Dr. Kasserman has become a regular, well-known, and highly valued

patron of the Hollywood Casino. He has become more experienced and skillful at the game he enjoys playing. Equally important, he has become well acquainted with many other people who play Blackjack, as well as numerous staff members at the casino. He has made many friends who share similar interests, and developed a new social setting that he looks forward to being a part of.

11. Casinos reward their best customers in a number of ways. After Dr. Kasserman had established himself as a regular player, and a trusted, desirable individual whom the casino wished to have in their establishment, Hollywood Casino- Columbus (and their parent company Penn National) assigned one of their employees to be his "host". These hosts assist the customer, answer questions, advise their customers of upcoming events, and offer them special benefits or "perks" for their patronage of the casino.

12. Dr. Kasserman was given the status of "Owner's Club Level", and issued an identification card indicating he was to be accorded the privileges of that status at all Penn National-operated casinos nationwide. At the Hollywood Casino-Columbus there is an annual dinner to which these preferred customers are invited. Gifts of free trips are offered, and David once participated in an expenses-paid trip to one of the company's Las Vegas hotel/casinos. These preferred customers are also offered shuttles and free tickets to the Memorial Golf Tournament, and to Ohio State football games. Dr. Kasserman was invited to play and did play in exclusive Blackjack tournaments at affiliated casinos in Indiana and near Pittsburgh.

13. In addition, since retirement Dr. Kasserman has begun to take occasional trips to two other Ohio casinos which are not a part of the Penn National chain, one in Cincinnati and the other in Cleveland. After twenty or more trips to each, he has made friends with both players and casino employees in those facilities. Each has found him to be a desirable and welcome patron, assigned him a host and encouraged his return business as well.

14. During Dr. Kasserman's hundreds of Blackjack-playing sessions at Hollywood

Casino Columbus, and dozens of sessions at other casinos, sometimes playing as long as eight hours or more, he had never had a single problem or unpleasant incident in any casino, until the events which occurred in this case.

### C.  Relevant Facts About the Game of Blackjack

15.     In order to understand the constitutional violations committed by the Defendants, it is necessary to understand certain rules and procedures of the game of Blackjack.  These are relevant and important facts in the proof of Dr. Kasserman's claims.

16.     The Blackjack dealer stands behind a curved table.  There are five seats on the other side of the table at which players may sit to play.  The game can proceed with anywhere from one to five players.

17.     The object of Blackjack is to reach a point total of 21 or as close to 21 as possible without going over.  Hands that are closer to 21 than the dealer win.  Hands that are not, or hands over 21 points, lose.  Cards 2 through 10 have their face value. Jacks, Queens and Kings have a value of 10 points.  Aces are valued at 1 or 11.  If a player's hand is equal to the dealer's hand, it is a "push" and the player does not win or lose.

18.     A hand begins after the dealer confirms that all players have finished placing the bets they wish to make.  The dealer must allow enough time to make sure that each player's bet for the next hand is "set" before they begin to deal the cards.

19.     Going from the dealer's left to right around the table, the dealer then deals one card, face up, to each player and to the dealer.  They then deal a second card, face up, to each of the players, and second card to the dealer face down under their first card. The dealer then turns to the first player to their left.  That player may choose to "stand" (draw no additional cards) or to "hit" (draw one or more additional cards). The dealer addresses each player from left to right in turn, each deciding whether to take additional cards or not. After all the players have completed

their hand, the dealer may (or may not) take additional cards.  Then the dealer's "hole card" is exposed.

20.     If the dealer's point total is less than a player's total, or if the dealer exceeds 21, the player wins even money.  The dealer places chips in the winning player's betting circle equal to the amount the player bet on that hand.  If the dealer's point total is more than the players, without going over 21, the dealer wins and takes  the chips from that player's betting circle.  And if the dealer and player have the same point count, a tie or "push", the dealer simply leaves that player's wager in their betting circle.  The player is then free to leave those chips, increase them, or decrease them prior to the next hand.

21.     After the dealer settles up with all the players the hand is over and those cards are removed from the table.  Before beginning the next hand, the dealer must watch to make sure that each player has finished setting the amount of chips they wish to bet.  When the players' bets are all set, the dealer begins to deal the cards for the next hand.

22.     A problem arises if the dealer is going too fast.  There are slower dealers and faster dealers.  Typically the casinos prefer faster dealing because it results in more hands played per hour, and therefore more profit to the casino.  But beginning the next hand too quickly can be a problem for players, and particularly for those sitting on the dealer's right because they are the last ones to have their prior hand completed.

23.     It is a commonplace occurrence for a dealer to begin distributing cards before every player has had time to decide whether they wish to remove chips, leave  the same chips, or add chips to their betting circle for the next hand.  This has  happened to Dr. Kasserman many times and he has seen it happen to countless other players.  The casino understands that this is a common situation which arises on a daily basis, and so it is not treated as a big deal.

24.     When a dealer starts a hand before all wagers are set, and a player tells them so, the

dealer will often simply apologize. The player will finish setting their bet and the hand will go on. If either the dealer or the player makes an issue of it, a floor supervisor (commonly called a "pit boss") comes to the table, asks the player how much they were intending to bet, and permits them to put that amount in their betting circle. The dealer then finishes distributing the cards and the hand goes on as usual. The casinos accord the players a cooperative resolution of the issue because they know it is often the dealer's mistake.

25.     Aside from beginning to deal before the bets are all set, there are also other times when play is stopped by the dealer in the middle of a hand. This can occur in a number of different situations, for a wide variety of reasons. Sometimes play is interrupted by a new player sitting down at the table, or a "yellow card" indicating that the dealer should stop dealing cards from one 6-deck shoe and change to a new one, or the dealer stops to chat with another dealer or supervisor. These are just examples. When this happens, a supervisor may be consulted. The hand that was interrupted is often declared dead, the cards are removed, and a new hand is begun. Sometimes, however, even after an extended stoppage of play it is determined that the hand that was started will now be completed.

26.     One other important background fact is this. In a casino everything is watched and everything is recorded. At the Hollywood Casino in Columbus there is a Surveillance Office which operates 24 hours a day. There are ceiling cameras over every gaming table which record everything that occurs there. There are scores of additional cameras which record every inch of the casino from different elevations and angles. A staff of surveillance personnel are always monitoring the activities throughout the casino, and reviewing the video of anything that they find to be unusual or suspect. The State gaming agents are not employees of the casino, but they have access to the casino's Surveillance Office and to the recordings made there.

### D.  Dr. Kasserman's Complaints to the Ohio Casino Control Commission, Enforcement Division

27.    For some time, David Kasserman and other high-limit Blackjack players had discussed the Hollywood Casino's frequent manipulation of the rules and procedures to the benefit of the casino.   Hollywood Casino was making up new rules that did not exist in other casinos. They were applying the rules unevenly, sporadically, and the rules were not uniformly enforced. To Dr. Kasserman's knowledge, no one had reported these problems to the Ohio Casino Control Commission (often called the "Gaming Commission").

28.    The Commission and its gaming agents are supposed to be neutral.  The Commission has adopted rules specifying the manner in which casino gaming is to be conducted. Gaming agents work for the Commission's Enforcement Division, not the casinos.  They are vested with the duty to enforce the Commission's regulations and conduct investigations of violations by casino operators and their employees as well as by casino patrons.

29.    In May of 2022, an incident occurred while Dr. Kasserman was playing which he decided to challenge.  This involved a device known as a "Shufflemaster". The Shufflemaster machine is a card-shuffling machine used at Blackjack tables in the Hollywood Casino.  It has a program which has the capability to account for every card in a six-deck shoe.  If it detects a missing card, duplicate or extra cards, bent cards, or any other such problem, a red light comes on signifying that the cards are not correct.

30.    Dr. Kasserman was seated at a table with three or four other players.  The dealer began a hand, dealing at least one card to every player, and then stopped mid- hand, saying that he noticed the red light had come on.  From his experience over several years playing at Hollywood Casino Dr. Kasserman knew that this meant they would suspend play, so he picked his chips up off the betting circle.  But he was told  that he had to play the handout.  He protested, because the

red light meant the cards could be corrupted and the players should not be mandated to play a hand from a corrupted deck, but his protest was to no avail.

31.    David Kasserman decided that he would complain about this red-light incident and other issues the Blackjack players were having.  He contacted his host, Luis Cordero, in order to find out the proper procedure to register his complaint and have it investigated.  He was referred to a Mr. Tolzman, Director of Casino Marketing for the Hollywood Casino.  They met on June 1, 2022, they discussed the various issues, and Mr. Tolzman advised him that he needed to make a complaint with the Ohio Casino Control Commission.  Tolzman referred him to Defendant Kenneth Ward, supervisor of the Enforcement Division in Columbus.

32.    Dr. Kasserman had a series of phone calls with Defendant Ward during June of 2022, and they met once in the Hollywood Casino.  David believed that he was following proper procedure and that the problems he was complaining of were being recognized by the proper people. Gaming Agent Supervisor Ward told Dr. Kasserman that he was right, his complaint had merit, and that it sounded like the casino was not operating as the Commission's rules are written. Defendant Ward promised to send David the rules covering the issues about which David was complaining, and that they would take steps.

33.    At the same time that he was requesting help from the Commission, Dr. Kasserman was also pursuing a remedy with the Hollywood Casino officials.  On June 21, 2022, he met with his host Mr. Cordero and Ryan Hinthorne, Vice President of Casino Operations.  The meeting took place at the casino.  At this meeting Dr. Kasserman discussed a number of problems with casino practices in operating the Blackjack game, including the red-light incident and inconsistencies concerning the handling of those events; the speed of the dealers and the frequent failure to confirm that all wagers were set before beginning to deal the cards; and varying policies on "mid-shoe entry", involving when new players could join the table.

34.     After the meeting with Mr. Hinthorne, Dr. Kasserman texted his host Mr. Cordero thanking him for arranging the meeting, and Cordero responded, "I'm glad to be of service and hopefully we will see a positive impact out of this meeting." After the meeting Mr. Hinthorne also wrote to David, thanking him for taking the time to meet and advising that "I will reach back out after I get a chance to talk to the team about your concerns."

35.     Dr. Kasserman's complaint about the practices of the casino also reflected on the gaming agents who worked in the casino every day. If the dealers and supervisors in the high-stakes Blackjack room were violating the rules, then the gaming agents were failing to enforce the rules. By speaking to both entities Dr. Kasserman had addressed both sides of the problem. And the supportive responses from Mr. Ward and Mr. Hinthorne were encouraging. Dr. Kasserman believed that the casino and the gaming authorities would investigate and make corrections.

36.     This is not what happened, however. Defendant Ward never provided the relevant gaming rules to Dr. Kasserman as promised. The complaints made to the Commission were never investigated at all. Instead, the fact that Dr. Kasserman had complained about them was rapidly communicated to the gaming agents who worked at the Hollywood Casino in Columbus. Within just a matter of days, seriously adverse actions were taken by agents of the Enforcement Division against Dr. Kasserman.

**E.  Retaliatory Actions By The Defendants**

37.     On two consecutive dates, July 1 and 2, 2022, the Defendant gaming agents made a series of criminal accusations against Dr. Kasserman, arrested him, banned him from the Hollywood Casino, physically assaulted him causing injuries, and initiated five different prosecutions against him, all false. The Defendants committed these constitutional violations against Dr. Kasserman immediately after learning of his critical report to their employer. These actions were taken, in whole or in part, in response to Dr. Kasserman's constitutionally protected

activity.

### 1.   The Event on July 1, 2022

38.     Dr. Kasserman was playing Blackjack at the high-stakes table on the evening of June 30/July 1, 2022.  At or about 12:25 a.m. on July 1, Dr. Kasserman was seated in the last position, to the dealer's right.  There were one or more other people playing at the table.  At that time an event arose from an unreasonably fast dealer who failed to make sure all bets were set before beginning to distribute cards.

39.     The previous hand had just ended.  Dr. Kasserman decided he would wager $150.00 on the next hand.  He first placed a black, $100.00 chip in his betting circle.  He cannot remember if that chip was left there from a "push" in the prior hand or whether he took it from his stack of black chips and put it there.  Then he immediately picked up two green $25.00 chips off the top of his stack of green chips and began to move them to the betting circle.  As he reached out to put those chips in and complete his wager, he saw the dealer take a card from the card holder to begin the next hand.  It felt like she was racing to get the card out first.

40.     Dr. Kasserman believes that he placed the chips on the circle before the dealer passed out the first card.  The dealer later claimed that she dealt the first card before the chips went in.  In either case, the two things happened within one second of each other.  But it makes no difference.  It is the dealer's duty to make sure all bets are set before distributing the first card, and in this case Dr. Kasserman was clearly, visibly in the process of moving chips in.  This was precisely the type of rules violation that Kasserman had been reporting to the Commission and the casino.

41.     After dealing one card to the first player, the dealer stopped and chastised Dr. Kasserman for allegedly getting his chips in too late.  David did not feel like being picked at by the dealer. The game was no longer fun.  Rather than get into a dispute, or challenge the dealer and call

for a supervisor, he decided he would just leave. He did not engage in any loud or argumentative comments. He just picked up his chips, gathered his personal belongings, and left the table. He walked through the casino out to the parking lot and drove home.

42.    Dr. Kasserman never imagined that this unpleasant moment would lead to anything further. Why would it? Unbeknownst to the Plaintiff, however, the Defendants moved without delay to take action against him. Since the gaming agents work in the casino, they spend more time than almost anyone else watching Blackjack and other table games. They knew full well that this was merely an everyday, routine matter which was normally resolved informally. They knew that Dr. Kasserman had not engaged in any nefarious conduct. But in this instance the gaming agents opened a "criminal investigation" case and prepared felony charges against Kasserman. They were looking for any excuse to get Dr. Kasserman in trouble.

43.    It all happened very swiftly. One of the agents on the scene, Defendant Milind Patel, took the lead. Defendant Agent Hendricks was listed as his backup. These Defendants began their investigation only minutes after Dr. Kasserman left. By 1:45 a.m. the agents had called the dealer in, conducted an interview, prepared a detailed written "voluntary statement", and had her sign it. Defendant Patel was the witness for the making of the statement.

44.    By 4:30 a.m., without ever speaking to Dr. Kasserman, the criminal investigation had already made its finding. The agents concluded that Kasserman was guilty of violating O.R.C. §3772.99(E)(4), an F-5 felony. Knowing that his supervisor would be anxious to hear about this, Defendant Patel sent Defendant Ward an email at 4:39 a.m. It read in pertinent part as follows:

> Subject: David Kasserman Cheat . . .
> Today, July 1, 2022, Mr. David F. Kasserman was observed cheating at the Blackjack game   I want to give you heads up regarding this, so you are aware of it, in case he try to contact you. I still need to speak to him and get his statement. Dr. Kasserman is in violation of ORC. 3772.99(E)(4), Alters or misrepresents the outcome of a casino game on which wagers have been made after the outcome is made sure but before the outcome is revealed to

12

the players. At 6:08 a.m. Defendant Ward sent back a two word response, "Oh boy".

45.     Defendant Agent Patel prepared a formal OCCC-Division of Enforcement report, dated 07/01/2022, stating the description of the event as "David F. Kasserman – Cheat at Table Games". Patel was listed as the "Reporting Law Enforcement Officer," Defendant Hendricks was the "Backup Law Enforcement Officer". Patel's report gave a synopsis of the offense as follows: "Above listed suspect was observed cheating at the Blackjack table game." The "recommendation" at the end of the report was this: "Agent Patel recommends this case be submitted to Franklin County Common Plea Court to present it to Grand Jury for indictment on violation of ORC 3772.99(E)(4)". The report also stated: "Approved by: Ward, Kenneth," Patel's supervisor at the OCCC Division of enforcement. The report states that it was disseminated "SYSTEM WIDE."

46.     On that same morning Defendant Agent Patel also told Hollywood Casino employees that Dr. Kasserman had been caught cheating. He told them about his criminal case, and that if they saw Kasserman in the casino the gaming agents were to be notified. Among the Hollywood personnel given this report were the people working in the Surveillance Room.

47.     The application of the criminal offense cited by Defendant Patel to this situation was facially without probable cause. Section 3772.99(E) of the Ohio Revised Code begins with this mandatory element: "(E) A person who **purposely or knowingly** does any of the following commits a felony. . . ." Then there is a list of various specific acts. Subsection (4), the one the Enforcement Division accused Dr. Kasserman of violating, reads in full as follows:

> (4)     Alters or misrepresents the outcome of a casino game on which wagers have been made after the outcome is made sure but before the outcome is revealed to the players;

Dr. Kasserman completed setting his bet before the dealer dealt the first card to the first

player, but even if he had not, that conduct would in no way have constituted a violation of this criminal statute.

48.     There were several elements of the alleged offense for which Defendants Patel, Hendricks and Ward had no probable cause whatsoever.  One glaring example will suffice.  It is a mandatory, essential element of this offense that the accused did something "after the outcome [of the casino game] is made sure."  That was not the case when Dr. Kasserman placed his bet.  The outcome of that hand of Blackjack <u>was not</u> yet "made sure".  In fact, the outcome would not be made sure until after all players and the dealer had received all of their initial cards, <u>and</u> after all players and the dealer had completed their decisions about taking more cards or not.  For example, the dealer might have taken a card, drawn a 10 or face card, and "busted" (gone over 21).  That would change the outcome for any players with point totals lower than 21.   At the time Dr. Kasserman put in his bet and the dealer dealt the very first card of the hand, the outcome of the hand was far from established to a certainty.

49.     The report prepared and approved by these Defendants was intentionally false, as were Defendant Patel's other communications described above.  Dr. Kasserman had done nothing wrong, nothing criminal, on July 1, 2022.  The Defendants were simply upset with Dr. Kasserman complaining about them to the Gaming Commission.  This is why they were treating this one hand of Blackjack in a manner differently from normal.

50.     In the meantime, Dr. Kasserman had no idea any of these things were happening. He had no inkling of what was about to occur, the next time he walked into the Hollywood Casino.

## 2.  July 2, 2022 – The Defendants Confront, Arrest And Assault Dr. Kasserman

51.     The events described above occurred late on a Thursday night, after midnight.  On Saturday morning Dr. Kasserman decided he would go back to the Hollywood and play for a while.

He drove to the casino, walked in and headed for the high-stakes Blackjack room. He ran into a friend who was already there, a man named David Xia (pronounced like "Shaw"), sat down next to him, and began to play. There was also a third player at the table. Much of what happened on July 2, 2022, described below, was captured on video. That video will be filed by hand as an exhibit to this Complaint.

52.     The minute Dr. Kasserman entered the casino, Hollywood employees contacted the gaming agents on duty and advised them he had returned. Both a table games supervisor and the Surveillance Room personnel alerted the agents immediately. This demonstrates how widespread the false allegation of Dr. Kasserman being "caught cheating" had circulated in such a short time.

53.     The agent who had initiated the criminal case, Defendant Patel, was not in the casino at that time. Defendant Jolliff received the reports and asked Defendant Hendricks to call Patel. In response Patel advised that he wanted them to speak to Kasserman. This was purely a formality required as part of the investigative process because the outcome had already been determined.

54.     While all this was going on Dr. Kasserman was playing Blackjack and talking with his friend Mr. Xia. As they played, Mr. Xia told Dr. Kasserman that he had come to the casino by Uber. Dr. Kasserman offered to give his friend a ride home when they were finished playing, and Xia said that he would appreciate a ride. The two men sat together, talked and played for about an hour before the agents approached and confronted David Kasserman.

55.     While they were playing, an event occurred which stalled the game for over 10 minutes. This event involved the other player at the table. The dealer began a hand by dealing that individual his first card, but then she stopped. She had noticed that this player's bet was beneath the minimum amount for the high stakes table. Therefore, it was an improper wager. This was something the dealer should have seen and corrected before starting to distribute cards, but she did

not.

56.     Believing that the hand was dead, Dr. Kasserman took his chip out of his betting circle.  However, the dealer turned to him and said he should leave his chip in the circle because it had not yet been decided whether this hand could continue or not. So Dr. Kasserman put the same chip back into the circle as requested.  According to  the casino surveillance camera his chip was out of the betting circle for only about 12 seconds.  The controversy with the player who had made the improper wager continued for eleven minutes, from 7:01 until 7:12 a.m.  First one supervisor and then another came to the table to consider the matter.  Finally, a decision was made that the hand could continue.

57.     This particular occurrence exemplified the issues that Dr. Kasserman had raised in his complaints to the Commission and the casino.  A dealer in a rush to move the game along quickly begins to deal before carefully checking the bets first.  As described in paragraph 30 above, these stoppages were quite common at Hollywood Casino.  They were dealt with in inconsistent and unpredictable ways, causing  confusion among the players.  Moreover, the gaming agents and casino employees who worked there knew those things.  But the people who were surveilling Dr. Kasserman the entire time he was in the casino that morning observed this event and decided to use it as another opportunity to create trouble for him.

58.     After playing resumed, Dr. Kasserman continued playing cards for about half an hour.  Everything was normal and uneventful.  Casino video recording show that at 7:39 a.m. Assistant Supervisor Chuck Chiappone had arrived at the entrance to the high-stakes Blackjack room.  Mr. Chiappone was someone with whom Dr. Kasserman was familiar.  He was joined by three other men dressed in ordinary leisure attire.  These were people whom Dr. Kasserman did not know.  To the best of his memory, he had never seen them before.  We now know them to be Defendants Duncan, Hendricks and Jolliff, three gaming agents who worked at the Hollywood

16

Casino.

### (a)   The Confrontation

59.     The agents stood by the entrance to the Blackjack room for some time, talking among themselves.  Dr. Kasserman was sitting facing the other way and was not aware of their presence until Mr. Chiappone approached him from behind and called his name.  He turned and Chiappone said he needed to speak to David.  Dr. Kasserman got up and followed him to the room entrance where the other men were standing.  Mr. Chiappone pointed to one of the men, Defendant Jolliff, and said something.  Dr. Kasserman did not see it at the time, but it appears on the video that Defendant Jolliff quickly flashed a badge held down below his waist, then put it back in his pocket.

60.     Assistant Supervisor Chiappone did the talking to begin with.  He claimed that Dr. Kasserman had been caught cheating at Blackjack the day before.  Kasserman listened and then, realizing Chiappone was talking about the last hand on his previous visit, David began to explain what had really happened.  He started to tell Chiappone about the dealer's mistake, how he was putting in his wager first and she did not wait for him to finish before reaching for a card.  But Dr. Kasserman had barely begun to speak when Agent Duncan intervened and ordered him to "shut up, stop talking."  When Kasserman tried once more to speak, Defendant Duncan angrily told him he was kicked out of the casino.

61.     This entire conversation described above lasted only 45 seconds or less. In his report on this incident Defendant Duncan suggested that the agents were trying to interview Dr. Kasserman, at the request of Agent Patel, about Patel's report the day before.  But this was clearly not the case.  They didn't ask Dr. Kasserman a single question, and when he began to volunteer the accurate description of the event they were speaking of, they silenced him.  They did not want to hear from him. The decision had already been made to prosecute David Kasserman.  The

agents were there to initiate a confrontation.

### (b)  The Violent Arrest

62.     As soon as Defendant Duncan ordered Dr. Kasserman to get out, Kasserman turned, shrugged, and walked back over to the Blackjack table where he had been playing.  Dr. Kasserman was obeying Duncan's order.

63.     Rather than simply stand and watch Dr. Kasserman, Agent Duncan continued to loudly berate him, raising his arm like an umpire in a baseball game and repeating "you're out of here" or similar phrases.  Dr. Kasserman walked to the table  and lifted his jacket off the back of his chair.  As he was putting his jacket on to leave, both Mr. Chiappone and Agent Duncan walked over closer to the table and stood adjacent to Kasserman, in close proximity.  David zipped up his jacket.  He picked up all his chips and put them in his pocket.  When he turned around Duncan was behind him, only a few feet away.

64.     Dr. Kasserman took a step backwards and then stepped to his left, trying to walk around Defendant Duncan toward the exit.   As he did so Defendant Duncan  took a step closer, face to face with Kasserman and nearly brushed against him as he passed.  Dr. Kasserman turned his face away and walked on past Duncan to the exit.

65.     Since Dr. Kasserman had been asked to get up from the Blackjack table, his friend Mr. Xia had remained seated there watching the events unfold.  When Kasserman arrived at the large opening leading out into the main casino he stopped, turned,  put his arms out  to his  side  in a  questioning  gesture  toward  Duncan,  asking something like "why am I kicked out." At that moment he saw Mr. Xia sitting at the table looking at him and remembered that he had promised to give Xia a ride home.

66.     Dr. Kasserman took two steps, and only two, in the direction of Mr. Xia, intending to tell him that he would be unable to drive him home.  When he did this, Dr. Kasserman was still

over at the exit.  As Kasserman began to speak to Mr. Xia Defendant Duncan said something to him.  Dr. Kasserman stopped and turned toward Duncan.  Agent Duncan instantly grabbed Dr. Kasserman by the front of his jacket and pulled him around face-to-face.  At the same time Defendant Hendricks stepped forward, grabbed Kasserman's left arm, and the two men proceeded to violently shove him along the wall of the Blackjack room into a corner.  As they did this Dr. Kasserman raised his right hand in a surrender pose.  He could not raise his left hand because Defendant Hendricks had a tight squeeze on it and was trying to twist it up behind Kasserman's back.

67.     In the corner, Agents Hendricks and Duncan engaged in several uses of force which were hurtful to Dr. Kasserman.  Most notably, they were holding and twisting his arms in a way that was extremely painful to him; Defendant Hendricks shoved his fist into Plaintiff's throat; and they were pulling his hands and arms upward behind his back so far that it felt like something was going to break.

68.     The agents' uses of force against Dr. Kasserman were entirely unnecessary and excessive.  They did not give him an opportunity to comply voluntarily before resorting to violence.  Rather, it was their first and only approach.  The officers did not advise Kasserman that he was under arrest.  They did not instruct him to place his hands behind his back and warn him that if he did not obey then they would use force to handcuff him.  This was a direct violation of the Division of Enforcement Directive on Use of Force, CCC-ENF-06.  This policy requires gaming agents to "give a verbal command before any force Is used."  The policy further specifies that a "verbal command" must include: "an agent's direction to an individual to do something, along with a warning of impending action if the individual fails to comply with the direction."  Defendants Duncan and Hendricks violated this rule, and Defendant Jolliff stood by, backed them up, and observed this violation without taking steps to intervene.

19

69. There were several other circumstances which rendered this rush to violence unreasonable. First, Dr. Kasserman was unarmed. His hands were empty, and he was visually expressing surrender before the uses of force occurred. Second, Dr. Kasserman was surrounded by at least four men at the time. Three of them were trained law enforcement officers. All of them were younger and larger than Dr. Kasserman. There was no reason to believe that a request for voluntary compliance would be ineffective.

70. In *Graham v Connor*, 490 U.S. 386 (1989) the Supreme Court provided a list of factors to be considered in determining whether a particular use of force by law enforcement officers was or was not reasonable. Under the circumstances existing when Defendants Duncan and Hendricks chose to assault Dr. Kasserman, each and every one of the *Graham* factors suggests these uses of force were unreasonable.

71. The first *Graham* factor relevant to the reasonableness of force is "the severity of the crime at issue." The Defendants' later-stated grounds for this arrest were allegations of "disorderly conduct" and "trespass." Both are lower level misdemeanors and neither is a crime involving violence. The severity of the crimes at issue here certainly did not support uses of force upon the arrestee.

72. The second *Graham* factor is "whether the suspect poses an immediate threat to the safety of the officers or others." At the time when Defendants Duncan and Hendricks engaged in their various uses of force against Dr. Kasserman, there were no facts which would suggest he was a threat, immediate or otherwise, to anyone. He never struck, kicked, shoved or grabbed anyone, nor did he attempt to do any of those things. He never took a fighting stance, made threatening statements or engaged in any other conduct reasonably suggesting an intention to hurt anyone. None of the Defendants ever even expressed any fear or threat from Kasserman. This factor militated against the use of any force.

73.     The third *Graham* factor is whether or not the arrestee "is <u>actively</u> resisting arrest." There is no evidence that Dr. Kasserman, actively or even passively, resisted arrest.   In his Affidavit Establishing Probable Cause filed in the Franklin County Municipal Court, Defendant Duncan swore that Dr. Kasserman "fought agents", but this was not true.   He took no aggressive action against them.   Kasserman tightened up, tried to move his body, and took steps while in the grasp of the officers only to protect himself or to lessen the pain.  When Defendants finally stopped manhandling him he stood entirely still while the final handcuffing took place.   The complete absence of active resistance also suggested force was unnecessary.

74.     The fourth *Graham* factor is whether the arrestee was "attempting to evade arrest by flight."  When Dr. Kasserman was grabbed and the force began, he had taken two steps into a small, enclosed room with no other exit except the one the Defendant agents were standing in. This could never be mistaken for an attempt to escape, nor did any of the Defendants suggest that it was.  Again, this factor does not support the use of force.

75.     Finally, *Graham* indicates that officers may sometimes have a justification when they are forced to make a "split-second judgment" about whether it was necessary to use force. This was not a situation in which any split-second judgment was required. Thus, the arrest of Dr. Kasserman met none of the criteria established by the Supreme Court for law enforcement officers to use force on a person being arrested.

76.     Later that day Agent Hendricks submitted a Use of Force Report, on an official OCCC form, regarding the arrest of Dr. Kasserman.  He listed the specific reason for their use of force as "necessary to effect arrest."  He also reported that the subject was under arrest at the time of the incident.  Defendant Ward, as the supervisor of Defendants Hendricks, Duncan and Jolliff, reviewed the Use of Force Report, and approved the gaming agents' uses of force.  He wrote on his Supervisor's Review, "I found that agents followed OCCC Policy and utilized the appropriate

amount of force required to effect the arrest of Kasserman."

(c)   <u>The Assault in the Elevator</u>

77.     As Defendants Duncan, Hendricks and Jolliff took Dr. Kasserman from the Blackjack room cuffed behind his back, he turned to Mr. Xia and apologized for being unable to take him home.  The Defendants then paraded Dr. Kasserman through the casino, in view of employees and customers alike.  They left the public area and entered long hallways, headed to the private security elevator. As they walked, Defendant Hendricks would occasionally pull Dr. Kasserman's handcuffed arms back and upward causing him pain.

78.     They reached the elevator leading to the basement, where the Security Detention Room is located. When they arrived at the elevator Defendants Hendricks  and Duncan were both holding Dr. Kasserman from behind, Hendricks grasping his left arm and Duncan his right. Kasserman was entirely calm and cooperative.  As all three men entered the elevator, Defendant Duncan let go of Dr. Kasserman, pushed the elevator button, and then turned facing the other two.

79.     Once he was fully inside, Dr. Kasserman began to do what people normally do in an elevator, turn and face forward toward the door.  But the gaming agents had other plans for him. Defendant Hendricks, still holding David's arms tightly with his right hand, pressed his right forearm in Dr. Kasserman's back.  He then  reached around with his left hand and grabbed Kasserman's shirt and jacket at the neckline, pulling them forcefully downward onto his back, exposing a strip of skin. Hendricks twisted him forcefully until he was facing the back wall of the elevator.

80.     There is a surveillance camera mounted in the upper rear corner of this elevator.  It covers and records the entire interior of the elevator except the area beneath it in that one corner. After Defendant Hendricks positioned Dr. Kasserman against the rear wall he drove Kasserman directly into the corner beneath the camera, using his hands and upper body.  Dr. Kasserman was

22

slammed face-first into the wall. Blood immediately began to pour from both the inside of his nose and from a cut across the bridge of his nose. Defendant Duncan participated by holding or guiding Kasserman's body with his left hand. The contact between David's face and the wall is not visible on the recording, but the force that caused it is mostly visible. This series of forceful actions by Defendant Hendricks happened very quickly, within the first 5-6 seconds after they entered the elevator.

81. This violence was nothing less than a gratuitous, intentional assault. Dr. Kasserman was a cooperative, handcuffed prisoner confined in a very small space. He was not kicking, or thrashing about, or out of control in any way. Defendant Hendricks later reported to his superiors that Kasserman's injuries to his face occurred because Kasserman "purposely ran his face into the elevator wall." This was just a lie, and probably was the reason Defendants Duncan and Hendricks chose to commit the assault in the only area of the elevator where it could not be viewed by the camera. Again, Defendant Ward approved this use of injurious force in the elevator.

82. As the hallway cameras in the basement reveal, Dr. Kasserman's face was bleeding significantly as he was brought out of the elevator and walked to the security office. Medics were called. They treated the injuries with a saline solution. Based upon decades of treating people with broken noses, Dr. Kasserman felt it was likely his nose was broken, but he also knew that there was nothing that could be done except to let it heal. It was quite painful for a few weeks, and then the pain receded. A photograph showing the cuts and scrapes to the Plaintiff's face is attached.

### (d)  Held in the Detention Cell

83. Upon arriving at the security office, Dr. Kasserman was taken into a small detention cell. He was still cuffed behind his back. He was told to put his head to the wall and spread his legs. He was given a pat-down search by Defendant Hendricks. He was then placed in a seated position on a bench. A short chain attached to the bench, with a handcuff on one end, was

tightened around his right arm adjacent to the handcuffs. This prohibited him from standing up.

84. Soon Defendants Duncan and Jolliff entered the cell. Agent Jolliff asked Agent Duncan "do you want them off or on", referring to the handcuffs on Kasserman's wrists. So Defendant Duncan put a hand on Dr. Kasserman and asked "Are you gonna settle down, or what are you gonna do?" In a calm voice Kasserman began to answer, saying "I was never. . ." Defendant interrupted him, "I asked you a question!" Duncan was clearly agitated. Kasserman tried again, "I was never. . ." Duncan, interrupting again, instructed Defendant Jolliff to "leave 'em on."

85. Dr. Kasserman said to Duncan, "It was on tape, it's on tape why my nose is bleeding." Defendant responded, somewhat inaudibly, concerning the incident on the elevator, ending his remarks with ". . . you dumb ass." Kasserman responded calmly but sarcastically, "Oh, I did that, sure. I did it." Duncan called Dr. Kasserman "an idiot" and said "I ain't gonna talk to you."

86. Defendant Duncan began to reach into Kasserman's jacket pockets and take out his personal property. Dr. Kasserman asked him what he was doing. Duncan bent down, put his face only inches from Kasserman's face, and exclaimed, "You're going to jail." The Plaintiff asked him again why he was taking his keys and other items out of his pockets. Duncan said, "you don't need that stuff where you're going," and walked out of the cell.

87. Defendant Jolliff had removed the original handcuffs by this time, but Dr. Kasserman was still chained to the bench by his right wrist. Defendant Hendricks asked him if he had been drinking and Kasserman answered "not a drop." Agent Duncan came back in, the others left, and Duncan again told Kasserman "you gotta just settle down." Speaking quietly, Dr. Kasserman told him, "You may have broke my nose, you do all this stuff and now you're telling me to settle down? I'm fine. I'm fine. I'm settled down." Duncan walked out again.

88.     Dr. Kasserman sat there for several minutes, and eventually Defendant Duncan returned to the doorway.  He said "I'm trying to be nice to you", and Kasserman answered very quietly, "No you're not, first you tell me to shut up, and it just went from there, telling me 'you're not too smart are ya, what's wrong with you'. . ." Duncan left with a dismissive waive of his hand.

89.     Later the medics came, and as described above, gave Dr. Kasserman sanitary wipes to clean the blood off his face, nose and hands.  Several minutes later a uniformed Columbus police officer came in.  They had an entirely cordial and pleasant conversation, and the officer left.  Finally, a casino employee was requested to come and instruct Dr. Kasserman that he was now banned from the Hollywood Casino, and a young man named Brian Wilks came and communicated this verbally.

90.     It was nearly 9:00 a.m. when the police officer returned and unlocked Dr. Kasserman from the bench.  He had spent well over an hour in the custody of the Defendant gaming agents.  He was taken to the casino security booking desk where all of his personal belongings were returned to him.  The uniformed officers escorted him out of the casino and placed him in the Columbus Police vehicle, but he was not taken to jail.  Instead, the officer just drove Dr. Kasserman to his car in the parking lot and told him he could go on home.

### (e)  The Agents Pursued Criminal Charges

91.     The Defendant agents alleged that Dr. Kasserman committed both misdemeanor and felony crimes.  We begin with the misdemeanors.  After the arrest of the Plaintiff on July 2, Defendant Duncan drafted, signed and attested to 3 separate misdemeanor criminal complaints.  He did so based upon his own false reports and statements, as well as those of Defendants Jolliff and Hendricks.  Specifically, Duncan prosecuted Dr. Kasserman for "persistent disorderly conduct" (M-4), "criminal trespass" (M-4), and "resisting arrest" (M-2).  His supervisor Defendant Ward approved the filing of these charges. Each of these charges was filed without probable cause.

Copies of the three complaints are attached.

92.     The persistent disorderly conduct charge accused Dr. Kasserman of violating O.R.C. §2917.11(A)(2).  Duncan swore that Kasserman "did recklessly cause inconvenience, annoyance or alarm to . . . casino personnel and state gaming agents, by making unreasonable noise or making an offensive coarse utterance. . . gesture. . . or display, or communicating unwarranted and grossly abusive language, to wit: did yell inside the casino and refuse to cease behavior after given a warning to do so."  This sworn accusation was knowingly false.

93.     Dr. Kasserman never yelled.  He was told he had cheated the night before and he was disagreeing, attempting to explain what had actually occurred.  Dr. Kasserman was charged with this crime merely for disobedience.  Having begun to speak in his own defense he had been rudely ordered by Agent Duncan to "shut up, stop talking."  When Kasserman began to speak again Duncan punished him by kicking him out of the casino, and subsequently by filing this charge.  But Agent Duncan had no legal right to order Dr. Kasserman to stop talking and remain silent in the first place.  In addition, there was no evidence that Dr. Kasserman's communication to Mr. Chiappone, disagreeing with the accusation of cheating, caused inconvenience, annoyance or alarm to any "casino personnel and state gaming agents" except for Defendant Duncan.

94.     The criminal trespass charge accused Dr. Kasserman of violating O.R.C. §2911.21(A)(1).  Duncan swore that Kasserman "did without privilege knowingly (enter or remain) on the (land or premises) to wit:  Hollywood Casino, Columbus, to wit: did refuse to leave the property after being warned to do so."  This sworn accusation was knowingly false.

95.     Dr. Kasserman never refused to leave the casino.  As soon as he was told to leave by Duncan he walked to the Blackjack table, put on his jacket, zipped it up, put his chips in his pocket, gathered his personal belongings and walked toward the exit.  His actions unmistakably demonstrated his compliance with Duncan's order.  His momentary turn at the door and effort to

speak to his friend Mr. Xia did not in any way signify a refusal.  Knowing that Dr. Kasserman's visible compliance had been recorded and would contradict an accusation of criminal trespassing, Duncan fabricated a story that Kasserman suddenly reversed his position and told the agents that he was not leaving.  But this was untrue.

96.     The resisting arrest charge accused Dr. Kasserman of violating O.R.C. §2921.33(A).  Duncan swore that Kasserman "did recklessly or by force, resist or interfere with the lawful arrest of himself, to wit: did refuse to be placed in handcuffs and pulled away and had to be forced into handcuffs by two gaming agents."  This sworn accusation was knowingly false.

97.     Dr. Kasserman never refused to be placed in handcuffs.  Defendant Duncan never told Kasserman that he wanted to or intended to put cuffs on him. During the time when Defendants Duncan and Hendricks grabbed the Plaintiff, shoved him along the wall and into the corner, squeezed and twisted his arms, pulled his hands upward behind his back and shoved a fist in his throat, Defendant Duncan had not even taken his handcuffs out of his pocket yet.  When the Defendants had stopped hurting him, they handcuffed him without any problem.  In addition, this was not a lawful arrest, an essential element of the offense.

98.     These charges were filed in Franklin County Municipal Court, and they were prosecuted by the Columbus City Attorney's Office, Criminal Division.  Dr. Kasserman retained a criminal defense attorney to represent him and paid a fee of $2,500.00.

99.     Dr. Kasserman had an arraignment on August 2, 2022.  He pled not guilty and filed a jury demand on August 17.  But then the video recordings of the alleged offenses were made available to the prosecutor and defense counsel in late August. On August 31, 2022, the prosecutor simply dismissed all three charges, without any effort to negotiate a plea bargain.

100.     In addition to the misdemeanors, the Defendant agents pursued two  felony charges against Dr. Kasserman, each accusing him of "cheating".  These accusations were both made by

Defendant Patel. The first of the felony crimes alleged was based upon the fast dealer situation that occurred on July 1, 2022. This is described fully in Paragraphs 43-54, above.

101. The second of the felony crimes alleged was based upon yet another routine occurrence while Dr. Kasserman was playing Blackjack on July 2, 2022, before his arrest occurred. The situation, a hand that was discontinued, is described in Paragraphs 60-61, above. Believing the hand to be terminated Dr. Kasserman took his chip out of the betting circle, but then immediately returned it when told to do so by the dealer. Kasserman did not give this non-event a second thought. He waited patiently through a ten-minute break in the action. When the hand was continued, he won and doubled his wager. At the same time, however, while the agents were preparing to approach and confront Dr. Kasserman they observed this particular situation and saw yet another opportunity to take adverse action against him.

102. The gaming agents' supervisor Defendant Ward wrote in a report about the events of July 2 that "while agents were on the way to speak with Kasserman he committed another cheat." The matter was referred to Agent Patel, who had already written up the report accusing Dr. Kasserman of having cheated on the prior date. Of course, Patel came to the same conclusion as his boss. The 12-second removal of his chip from the betting circle during the discontinued hand on July 2 was also a criminal act by Dr. Kasserman, worthy of prosecution.

103. Defendant Patel wrote another report, dated July 5, accusing Dr. Kasserman of cheating by lifting his chip briefly after the dealer dealt one card to a different player, then realized that player had made an improper wager (below table minimum) and stopped dealing. Patel recommended that the "case be submitted to the Franklin County Common Plea Court to present it to Grand Jury for indictment on violation of O.R.C. 3772.99(E)(5)." This report and recommendation was approved by Defendant Ward. The report containing this second accusation of cheating was then disseminated "SYSTEMWIDE", describing the topic as "Cheat at Table

28

Games David F. Kasserman."

104.    This time Patel tried to squeeze Dr. Kasserman's entirely innocuous conduct into a different subsection of the criminal statute. Whereas the July 1 allegation was based on subsection (E)(4), the July 2 allegation used subsection (E)(5), which says it is a criminal act if a person purposely or knowingly does the following:

> (5)  Places, increases, or decreases a wager on the outcome of a casino game after acquiring knowledge that is not available to all players and concerns the casino game that is the subject of the wager.

105.    The gaming agents had no evidence whatsoever that Dr. Kasserman had "acquired knowledge" that was "not available to all players" concerning the hand of Blackjack that they were playing. The only thing that had happened when play was stopped by the dealer, and when Kasserman briefly picked up his chip, was that the first card of the game had been dealt. But this was Blackjack, so the card was turned face up. That information, whatever the card may have been, was available to all of the players equally at the same time. This lack of probable cause would have been obvious to Agents Patel and Ward. Nevertheless, they publicized a second accusation of cheating against Dr. Kasserman and proffered the felony charge to the County Prosecutor in the hope of obtaining an indictment.

106.    Had the Grand Jury indicted Dr. Kasserman on the two felony offense requested by Defendants Patel and Ward, then Kasserman would have been facing up to 2 ½ years in prison. Fortunately, this is not what occurred. The Franklin County Prosecutor's Office received the request for indictment of Kasserman on the two charges. They opened a file on the request, Franklin County Case Number 1156069. Upon information and belief, they received the video recordings showing the supposed crimes. They reviewed the information provided. Then on August 31, 2022, they rejected the request and refused to even present the case to the Grand Jury for their consideration. Defendant Patel went down to the Grand Jury and spoke to the assigned

prosecutor but they still declined to submit the charges against Dr. Kasserman. The case was closed. This was the second different prosecutor's office to terminate proposed prosecutions of the Plaintiff.

107. Dr. Kasserman had played Blackjack in casinos since 1991. Since 2018 he had played this card game very often. He had played Blackjack in dozens of different casinos, but by far the majority of his time playing had occurred in the Hollywood Casino-Columbus. In tens of thousands of hands, Dr. Kasserman's play was never question. He was never thrown out of or banned from any establishment, and he was never accused of cheating by anyone. But just days after lodging criticisms with the Ohio Casino Control Commission, their agents had claimed to have caught him cheating on two consecutive dates.

108. The allegations of cheating proposed by the Defendants had been nonsensical from the start, and they knew it. Dr. Kasserman is aware that every single hand is recorded from above, to show everything that players and dealers do with their chips and their cards. How would he obtain some advantage by intentionally putting in his chips one second after another player's first card come out? He would not. How would he gain some benefit to his chances by picking up his bet when the play had been suspended after another player's first card had been dealt? He would not. The records indicate that Supervisor Ward initiated "a 30 days review for additional cheats" by Dr. Kasserman. They must have found nothing because there is no further mention of it. The accusations made against Kasserman were groundless and the Defendants knew it.

### (f)  The Aftermath

109. Very quickly after July 2, 2022, Dr. Kasserman's host began contacting him, to let him know that he was not barred from coming back. Hollywood Casino continued to send him announcements and invitations to events. He was a valued customer and they wished him to continue being one. They sent him a letter reassuring him that he was welcome there. For a long time this was psychologically impossible for Dr. Kasserman. Although he had done nothing wrong

he was afraid to go there.  He feared the possibility of more adverse treatment by the gaming agents.

He was totally embarrassed by the cheating accusations, and by being drug through the casino

handcuffed in front of many people he knew.  He did go to the casino in Cleveland a few times to

see friends and play.  Even there he ran into people who advised him that bad things were

circulating about him.

110.    Through all of July and August of 2022 Dr. Kasserman was forced to  worry about

the pending criminal accusations.  Would he have to go through a public trial?  Would it be reported

in the media?  What if a judge or jury actually believed the lies the gaming agents had said about

him?  By the first of September all criminal entanglements were finally over, and so that constant

weight was off his shoulders.

111.    Ultimately, on January 16, 2023, Dr. Kasserman felt able to return to the Hollywood

Casino and play some Blackjack again.  Old friends among the players, dealers and pit bosses

were very nice to him.  Even people whose names he didn't know were cordial and told him it was

nice to see him back. At the same time several people mentioned that "I heard about your incident"

and some would ask questions about it. He is now back to his previous routine of playing Blackjack

at Hollywood  Casino a couple of times a week.  In the months since he returned, Dr. Kasserman

has again had the experience where he is determining what he will bet on the next hand and a dealer

begins passing cards before he is set.  This has happened perhaps three or four times.  In every one

of those situations, he stopped the dealer, they called the pit boss over, they asked what he was

going to wager, and they permitted him to put that  amount into his betting circle.  In none of those

situations did anyone accuse him of cheating.

## FIRST FEDERAL CLAIM – RETALIATION

112.    The said acts by all Defendants, described above, constitute retaliation in violation

of the First Amendment and 42 U.S.C.§1983.  Dr. Kasserman engaged in constitutionally protected

conduct including free speech and petitioning a government agency for redress of grievances. All Defendants took adverse action against the Plaintiff that would deter a person of ordinary firmness from continuing to engage in such conduct. Those adverse actions included false accusations of criminal conduct, arrest without probable cause, prosecutions and threatened prosecutions without probable cause, and physical violence. The Defendants were motivated to engage in those adverse actions, in whole or in part, by the Plaintiff's protected conduct.

## SECOND FEDERAL CLAIM – ARREST
## WITHOUT PROSECUTION

113.    The said acts by Defendants Duncan, Hendricks and Jolliff, described above, constitute arrest without probable cause in violation of the Fourth Amendment and 42 U.S.C.§1983. All three Defendants participated in the seizure, arrest and detention of Plaintiff on July 2, 2022.

## THIRD FEDERAL CLAIM –MALICIOUS PROSECUTION

114.    The said acts by Defendants Duncan, Hendricks and Jolliff, described above, constitute malicious prosecution in violation of the Fourth Amendment and 42 U.S.C.§1983. These three Defendants all made, influenced, or participated in the decision to prosecute the Plaintiff; there was no probable cause for the criminal prosecution; Plaintiff suffered a deprivation of liberty apart from the initial arrest; and the criminal proceeding was resolved in the Plaintiff's favor.

## FOURTH FEDERAL CLAIM – UNREASONABLE FORCE

115.    The said acts by Defendants Duncan and Hendricks, described above, constitute excessive and unreasonable force in violation of the Fourth Amendment and 42 U.S.C.§1983. This claim includes both the unlawful violence committed in the Blackjack room and in the elevator.

## FIFTH FEDERAL CLAIM – CIVIL CONSPIRACY UNDER §1983

116.     The said acts by all Defendants, described above, constitute a civil conspiracy under 42 U.S.C.§1983. A single plan existed to injure the Plaintiff, all Defendants shared in the general conspiratorial objective, and overt acts including those listed in this Complaint, were committed in furtherance of the conspiracy which injured the Plaintiff.

## SIXTH FEDERAL CLAIM – SUPERVISORY LIABILITY

117.     The said acts by Defendant Ward, described above, establish supervisory liability against this Defendant. Defendant Ward participated in, encouraged, authorized, approved, and knowingly acquiesced in the unconstitutional conduct of the other Defendants.

## FIRST STATE-LAW CLAIM – CIVIL CONSPIRACY

118.     The said acts by all the Defendants constitute civil conspiracy under Ohio law. The Defendants combined, with malice, to cause injury to the Plaintiff, and engaged in the unlawful acts described herein.

## SECOND STATE-LAW CLAIM – SPOLIATION

119.     All of the Defendants had possession, custody, or control of evidence favorable to the Plaintiff, Defendants knew that litigation existed or was probable, Defendants willfully destroyed disposed of, or allowed to be destroyed the evidence to disrupt the Plaintiff's case, which did occur, causing damage to the Plaintiff.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, punitive damages, reasonable attorney fees and costs.

Respectfully submitted,

/s/ David A. Goldstein
**DAVID A. GOLDSTEIN (0064461)**
**DAVID A. GOLDSTEIN CO., L.P.A.**
511 S. High Street, Suite 200
Columbus, Ohio 43215
(614) 222-1889
(614) 222-1899 (Fax)
dgoldstein@dgoldsteinlaw.com
Attorney for Plaintiff

JURY DEMAND

The Plaintiff hereby demands a jury of eight persons to hear and decide this case.

/s/ David A. Goldstein
**DAVID A. GOLDSTEIN (0064461)**